Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw an eye and give their attention to the Court as now sitting. God save the United States and this Honorable Court. Good morning. We're having a key argument in our first case. Mr. Barnett. Good morning and may it please the Court, Dave Barnett for Pine Resources. As this Court knows, this case involves the sale of approximately 565 acres in Barber County, West Virginia. The case is simply one of contract interpretation and contract interpretation under the law of the State of West Virginia. While I understand the Court is well acquainted with the facts, let me give you some facts which play into the crux of my argument here today. My client, which is a two-person family business, was in the process in 2008 of selling property to PetraJ, PetraJ Texas Corporation. There were a number of pieces, leasehold property as well as fee property, was sold and were concentrating only on the fee property. And it matters because the same documents were used in both of the transactions with the single exception of the one-year and five-year provision, which was the development provision, which is really the crux of the argument and what was before the District Court here today. That particular agreement, the Section 5.7, was the obligation of the purchaser. And the interpretation of who the purchaser is by the District Court judge in this case is one of the fundamental errors this Court needs to correct. Under the provisions, there was a 60-day time period in which to have a meter tap, which in fact occurred. That was later disputed by Statoil. And then there was a one-year provision to drill the first well. And that well was not drilled in a timely manner. And as a result, PetraJ paid $100,000 as a delay rebel. And then subsequently, in December of 2011, completed the drilling of the first of the three wells required by the contract. Then in 2012, it was sold by PetraJ to Statoil, which is one of the ten largest oil corporations in the world and primarily owned by the country of Norway. At that particular time, or shortly thereafter the sale, the marketplace changed for oil and gas. And what I want to convey to this Court today is what we really have here today is a case of buyer's remorse. And what I mean by that is after the purchase was completed, the marketplace changed and the folks at Statoil believed that they no longer wanted to drill in this particular area. They were more focused on wet gas, and this particular area was believed to be dry gas. As a result, there became a number of negotiations that kind of bailed negotiations back and forth. The purchasing agreement we had with PetraJ required quarterly meetings, and there was a quarterly meeting to discuss drilling plan. And then there was sort of radio silence from Statoil after that period of time. It is critical to note that in the agreement, which was between PetraJ and Statoil, the agreement with PetraJ and my client Pine was included as Exhibit A. And also in Schedule 3.25 of that agreement, there was a clear statement, obviously approved by the attorneys that negotiated the deal, that there was a drilling obligation of two wells on our property, which had to be completed by April 1st of 2014. It was scheduled in the agreement between Statoil and PetraJ. They acknowledged it. They had a copy of the agreement attached as Exhibit A to their agreement. But yet, because of the change in the marketplace, they now moved to find a way to avoid the consequences of their deal. Well, the bottom line is, you want your purchaser to be purchaser's heirs in the science, don't you? Is that what you want? That's a great question, Judge Floyd. What the district court judge said was literally in the first line, because it says PetraJ as purchaser, says that's a defined term, and therefore it carries all the way through, and no other party could be the purchaser. Now, there are a number of factors that bear on that. The definitions actually fall below that, and there is no definition of purchaser in the original PetraJ agreement with my client Pine. However, the owner of PetraJ, the president of PetraJ, wrote at the time of the Statoil sale to my client, that, in fact, Statoil was stepping into the shoes of meeting all the obligations of the agreement, and that Statoil was now the purchaser. Statoil was now the purchaser. But what I'm saying is, we need not even go to those areas. Those are clear indications of what the parties knew at the time the transaction occurred,  and what Judge Berger did, she simply said, well, it now is purchasers only. It could be one party. Ignoring the section, which is the assignment section of 8.3, and that assignment section very clearly sets forth the obligation. If there is an assignment, this agreement shall be binding upon and inured to the benefit of the parties hereto and their respective successors and assigned. We have to look at the entire agreement before we can say what the agreement means. And it's clear the fundamental crux of this agreement was to have an 18% overriding royalty, which was set forth in a deed which accompanied it. And interestingly enough, the deed sets forth, if there's a dispute over the end of the reserves, it refers back to section 5.9. Now, what the district court judge also found, or agreed with Stadawell, was that section 5.9, which is called limitations on action, because there was no longer, the purchaser no longer held the minerals, that there were no longer any of these obligations present. Well, obviously there were obligations present. There was the 18% override. And in fact, how can we say that it's excluded? Because if we read 7.2, it says except sections 5.4 through 5.9. Except. And the reason it was accepted out is that this particular provision, 5.7, contains its own internal timetable. It requires a 60-day tap, a one-year well drilling, and two additional wells drilled within a five-year period. So it doesn't have to fall within a two-year period or any other statute of limitations. It sets forth in its own statement what the requirements are for anyone who holds title to that particular property. And that, again, is why the district court erred. Purchaser because of the assignment, purchaser because of the provisions of 5.7, purchaser, quite frankly, because of the 8.8 assignment provision, and the limitations on action not applying to 5.7, all lead us to one inescapable conclusion, that anyone who followed in the footsteps of Petro-Reg picked up their obligations and liabilities. And again, while it's not within the four corners of the contract, there are nine mentions in the Statoil agreement with Petro-Reg which talk about that very obligation to drill the two additional wells prior to the expiration date of the five-year period. It's difficult for me to understand how Judge Berger was able to arrive at a conclusion. I can only suggest that she failed to consider the entirety of the document. And again, the thrust of this document as opposed to the earlier documents was the 18% overriding royalty interest. And that 18% had a value our experts indicated was more than a million dollars. The initial consideration for this matter was about $475,000. So again, from an economic standpoint, the essence of the deal, the money that was in the deal, was really what was to come in the one-year and the five-year drilling program period. Now there's one other argument that is made, one other argument I think that pertains to this, which is made by Statoil. And their argument was that they didn't have an obligation to complete the other two wells, or at least complete them in an economic sense. Their suggestion is they simply had to drill two more holes. And while that is such a, quite frankly, ridiculous argument, is that these holes that they say they had to drill were multi-million dollar cost and expense. The initial hole drilled by Petra Edge, well, not Fract, cost them several millions of dollars. To do two additional wells would have cost an additional many millions of dollars. The suggestion that their only obligation was to drill these and then simply walk away from them defies economic sense. But again, while that argument's made, that's not an argument that's found in Judge Berkley. She gave very short and very, what I believe, a very insufficient review of the entirety of the record. And the entirety of this particular contract, as well as the subsequent contract, which transferred this particular piece to Statoil, indicates one thing, and that is there's an obligation to drill, an obligation to drill a total of three wells, and to do that within a period of five years. I'm happy to answer any questions. Here with Trevor, on the other side. Thank you very much. Thank you. May it please the Court. The judgment is correct, and it should be affirmed for two independent reasons. First, Petra Edge's obligation to spud wells under its purchase and sale agreement with Pine Resources expired when Petra Edge no longer held any interest in the mineral rights. And second, in any event, the failure to spud a well could never result in damages because the obligation to spud is only the very beginning of the drilling process and would not result in hydrocarbons in paying quantities. So there are no damages as a matter of law. Now, the district court ruled on the basis of contract interpretation, so let me briefly address that first. There are two key premises in the district court's reasoning. First, that purchaser is a defined term under the contract and second, that the purchaser obligation that's at issue in this case, which is spudding wells under Section 5.7, expired under Section 7.2a when the purchaser no longer held any interest in the mineral rights. So what is the purpose of 8.8 in that contract? 8.8 provides that there is a right to assign the contract. And we don't quarrel with the general assignability of the contract or even with general principles of assignment law, but the district court was absolutely correct when it stated that Section 8.8 does not modify the remainder of the contract. And it simply provides that its successors and their signs are to be bound by the contract terms, but you have to look to the contract to see what rights and obligations would survive the assignment. I don't even know what that means, doesn't modify the contract. How can a provision in the contract not modify? What does that mean? What that means is that while there is a right to assign the contract and the parties bargained for that ability, it wouldn't expand or reduce any of the other obligations. So you still have to give effect to all the other provisions. And I think the best way to understand this is the Katiga case that both parties have relied on because that is a case where it was a lease. The lessor and lessee agreed that the lease could be assigned and it was applying the general principle that the assignee would step into the shoes of the assignor, but the court specifically mentioned that the parties to the lease placed no restrictive language therein to make it operate differently in the event of the happening of such a contingency. In other words, if the parties assigned the lease, they didn't put any other terms in their contract that would modify what rights and obligations would flow to the assignee. And our contract is very different. And the key provisions, first of all, are the definition of purchaser. And I do want to point out, because Judge Floyd was absolutely right, Pine's position is essentially that you don't have to give effect to the definition of purchaser. You can read the more broadly into it. But they would concede that in the preliminary sections of this contract, there are six defined terms. There's execution date, agreement, seller, purchaser, parties, and party. These are all, in quotes, capitalized and underlined. But doesn't that, your reading of that, doesn't it make 8.8 superfluous? No, not at all. And how is that? Because 8.8, as I mentioned, provides that it is possible to assign the contract. But it doesn't override the defined terms of contract. And so by giving effect to the definition of purchaser, as PetroEdge, then you have to turn to the other provisions that apply specifically to purchaser. And in 5.7b, which is the spudding obligation that's at issue in this case, it says purchaser has the obligation to spud wells. And then what's really the key provision in this entire contract, on which this case turns, is Section 7.2. And I'd like to briefly walk through the first several sentences of this because I think this is where the case really turns. The very first sentence is a two-year limitation on certain representations and warranties. And the parties parenthetically accepted certain provisions. They accepted out Section 3.7 and Sections 5.4 through 5.9. Now, Pine wants to say these are accepted entirely from the contract. And we know that's not right because in the very next sentence, the contract addresses Section 3.7 and Section 5.4. So it's then addressing specifically some of the sections that have just been accepted out of the first sentence. And then the third sentence, and this is the key, it's what the parties are calling the residual clause. The remainder of this agreement shall survive the execution date so long as purchaser holds any interest in the mineral rights. And the reason this is so key is that it is contingent on purchaser, defined as petro-edge, holding an interest in the mineral rights. The clearest way of understanding why Pine's position is wrong is that if purchaser just kept getting redefined every time there was an assignment, then this sentence would never be operative. It would be perpetual because there would always be a purchaser to hold an interest in the mineral rights. And this sentence could be given no effect. And then the following sentence could be given no effect. The fourth sentence in Section 7.2a says, Representation, Warranties, Covenants, and Agreements shall be of no further force in effect after the date of their expiration. So we know that the parties bargained for certain obligations to expire. And you can't make this perpetual just by continually redefining purchaser any time that there's an assignment. We've cited in the Court the Restatement of Contracts, Section 203, that says an interpretation which gives effective meaning to all the terms is preferred to an interpretation which leaves a part of no effect. And to give credit to Pine's interpretation would render these two sentences in Section 7.2 completely meaningless. Because instead of certain rights expiring when the purchaser no longer holds the interest, they would never expire. It would be just the opposite of what the parties put in writing. Well, didn't Kotyga, it was just a term of lessee, and then they went on to say that Lisa Reed and I contained the following successors of the science provision, and they appended that to the term lessee for purposes of construing the contract. There's a West Virginia case called Grace that did the same thing. And then Judge Wilkinson wrote for this Court the same thing. They would leave an absurd result if you didn't have heirs of assignment, language attached to either purchaser or lessee. Are you suggesting the courts would read in assignment into a definition of a particular party? Yes. And I think that might be a valid result in a contract where there are no other limitations about what rights and obligations would pass when there is an assignment. And so that is the key distinction between this case and, for example, the Kotyga case, is that, in general, you would apply the common law to the contract. But the primary principle here is that you would always give effect to the contract term first. The common law does not override the contract. The contract terms are the bargain. And here, the bargain very clearly provides that certain rights expire when purchaser no longer holds these interests. And think about, for example, how this would be done in the industry if Pine's stated intent, now after the fact, that's, for all evidence, not what they put in writing in the contract. If their stated intent really had been to ensure that they're drilling and that no matter who became the holder of these mineral interests, that those parties would have to drill. The way you contract for those types of rights is generally through a lease where there is an obligation to drill and to produce hydrocarbons in paying quantities within a specified term. And if that doesn't happen, then there's a right of reversion where the lessor would get the mineral interests back and could drill themselves or lease to somebody else who will drill. But in this contract, the only obligation that they bargained for was to spud. They said you have to get a meter tap and you have to spud. And this, I think, is the part of the case that Pine cannot answer because the definition of spud is undisputed. We've cited several dictionary definitions in our briefs, but it is to begin to drill an oil well by alternately raising and releasing a spudding bed with a drilling rig. Or the Manual of Oil and Gas Terms says that spudding in is the first boring of the hole in the drilling of an oil well. So it's essentially breaking ground. And they have bargained with Petro-Edge that Petro-Edge would take the preliminary steps within certain time frames to break ground, but there's nothing in the purchase and sale agreement that actually would require them to carry through all the other steps that you must go through to actually get hydrocarbons in paying quantities. They don't have any obligation to drill a completed well. And that's fatal to their position. They have no answer to the fact that they bargained for a preliminary step and they cannot get money out of the failure to just begin a hole in the ground. Well, it might defeat their claim for damages, which I guess is your position, but why does it necessarily make the contract say what it says with respect to the assignment of rights? Well, this would be an alternative ground. And so these are two independent arguments. But I also think if you look at the obligations that Petro-Edge bargained for, I mean, they gave Pine half a million dollars up front for the benefit of an opportunity to drill these wells. And they did oblige themselves to beginning these wells within certain time frames, but they didn't burden themselves with an obligation to actually go through with the whole process. And, you know, Pine's eager to talk about changing market conditions. Well, that is absolutely the kinds of things that parties contemplate when they decide what burdens they're going to saddle themselves with. Petro-Edge did not contract for the obligation to go forward even if market conditions changed. And they certainly didn't contract for the obligation to have to saddle a potential assignee with that burden and restrict their ability to assign this contract. And so when you look at what Pine actually negotiated, they got half a million dollars up front, and they have a perpetual 18% overriding royalty interest. So that whoever drills these wells, if any party ever decides that it's in their own interest to drill wells, doesn't matter the number, Pine has a deed which gives it the right to an 18% overriding royalty interest. It still has that right. And that's in 5-9, right? It's in 5-9 of the purchase and sale agreement, but where that obligation lives on today is in the deed. So the reason that that is different than the contract is because the deed gave them that right. That's exactly right. In other words, you think that if you're correct, that there would have been the same argument about no assignment for all these things, right? That they wouldn't retain it because it says that the remainder of this agreement shall survive the execution date so long as the purchaser holds any interest in the mineral rights. So you would think, consistent with that, that there wouldn't be any retention by the other side of any interest, but they had the interest in the deed. That's exactly right, yes. So it is our position that under the plain language of Section 7.2, that 5.5 through 5.9 have expired. So their right, Pines' right, to the 18% overriding royalty interest is not through the purchase and sale agreement. It's through their deed. And they will get the benefit of their bargain. They've gotten a half a million dollars up front, which is not something parties normally get when they do this through leases, where they would have a right of reversion. And they have their right to the 18% overriding royalty interest for any party that ever drills wells. Without any contractual survivors, anything like that. They just had it. That's exactly right. And so their argument that this isn't what they bargained for just doesn't apply. They have their 18% overriding royalty interest. As the court knows, West Virginia law is quite clear that contracts are enforced as they are written. And I think what's so striking about this case is how quickly Pine turns away from the contract terms into extrinsic evidence. They want to look at the stat oil agreement. They want to look at their own principles testimony. But we know their principles are sophisticated businessmen. They both had run oil and gas companies before they struck this bargain. They were represented by counsel and they negotiated this deal in an arm's length transaction. And West Virginia law is quite clear that in those circumstances, you don't look beyond the terms of the contract. But you give effect to the terms exactly as they're written, where they are clear and ambiguous. And the district court was absolutely correct that this contract is clear and ambiguous. And what's also striking is that while Pine wants to look to extrinsic evidence, which is only permissible if there's an ambiguity, they have not come forward in the briefing to identify what's ambiguous and they have not proposed two alternative reasonable meanings. It's only under those circumstances where you would actually begin to look at extrinsic evidence. And in this case, they haven't even crossed that threshold to get there. But I would urge the court to really press them on this alternative argument about spudding because this is where they really have no answer, how they could ever have damages if an obligation to spud passed, which we, of course, deny, but how they could ever have damages from the failure to begin drilling when they never bargained for completed wells that would produce hydrocarbons in paying quantities. If the court has no further questions, I'd be happy to cede back my time. Thank you very much. Thank you. Mr. Burnett, why don't you start where your colleague left off and what is your response to that? It's an interesting argument they made since they didn't spud two additional wells that, in fact, spudding raises no issue. Let me make it absolutely clear, the spudding obligation was met by Petrotech by drilling a multi-million dollar well and it was clear between the parties. Did it have to be met in that way? I'm sorry? Did it have to be met in that way? Yes. Does spudding mean you have to drill a multi-million dollar well? Spudding indicates... That's not what I understood. It's the beginning of a process. Right. And the suggestion that you're going to... The beginning of the process to drill the multi-million dollar well, maybe. Well, quite frankly, Judge Motis, if you start the process, you're spending a significant amount of money to move a drill wick on, to get permitted, to begin the entire process. No one drills a 20-foot hole, backs out, takes all that equipment, moves away, and walks away from the obligation. Where do you get the 20-foot? It's just an arbitrary number. Yes, because I have actually... I've been doing this a long time. I've seen another case with spuds in it and they weren't any 20 feet and people did walk away. I don't think we can say it's a general rule. No, I'm not suggesting that. I thought that's what you were saying, that you inevitably, if you drill, you were in it for the long haul. But what I'm saying is the parties had a clear understanding and the parties being my client and Petr had, in fact, drilled a well. Their interpretation of their obligation within one year was to get a 60-day tap to begin the first well. They did, in fact, drill that well. It's now a functioning well. It's never been fracked, but that well is there. They met their spudding obligation. It's critical, though. Statoil has never met any spudding obligation. They want to make the argument that this deal could have been negated the day after my client and Petr had signed it, simply by assigning it to another party. Then the more than a million dollars worth of value to Pine simply could have gone away the next day had they turned right around and assigned to Party B or to Statoil or to Exxon or any other person. And there's no commercial logic. Your client got money up front, right? They got less than $500,000 up front, and the value of the deal was more than a million dollars if, in fact, they drilled the three wells and they got their 18% overriding royalty. And they set forth a time period so that this couldn't go off into infinity. The only real value to this particular family was to get these wells drilled within a period of time, in this case, five years, to say that the 18% overriding royalty, which, again, I want the court to understand the deed refers back to 5.9, again suggesting 5.9 is viable and active. All the sections of 5.4 through 5.9 are excluded out. They're excluded. Their argument is, well, it falls in the residual clause. Argument is, no, it's specifically excluded. And this particular section, 7.2, is referred to in the deed as a way of resolving the controversy at the point of exhaustion. If the deed, which goes on forever, refers back to it, how can it be gone? What is the logic to that? There is simply no commercial or economic logic to the argument Statoil wants to make. They want us to look at the contract and say, well, it's a foolish piece of paper which can be avoided simply by a next-day assignment to some party. And that's not the essence of the deal.  Well, it is kind of the four corners of the contract because we don't have anything about a survivor. Or an assignment. Well, we have the assignment provision. Well, okay. Usually, at the beginning of the contract, I mean, you've probably written more contracts than I have, maybe. But you say, you know, buyer and seller and assigns, and seller and seller and assigns. And that's what the contract says at the beginning. So there isn't any question about assignment rights, right? No, I think that there is a void. I hate to say this, but there is a void in the fact that in the defined terms, purchaser is not defined. So we really have to fall back on the remainder of the contract to understand what the purchaser is. And part of that that we fall back on are the provisions of the assignment provisions at 8.8, which says their respective successors and assigns will meet all of these obligations. What good would 5.9 be to the parties if you read assign and you had an assigning dispute? What good would it be if we don't read assignee into the terms purchaser itself? As to 5.9. I'm not sure I understand the question, but let me try to respond to it. I think that both the assignment provisions and the fact that the provisions of 5.4 through 5.9 did not expire. They were accepted out and then referenced in the deed, which essentially goes on forever. Those obligations go on forever. They create a kind of circle of logic which says that if this gets assigned, it's going to be governed by the one-year and five-year limitation, the 60-day TAP limitation also, which was met. But it continues on, and as long as the deed is present, those sections 5.4 through 5.9 are going to be the relevant sections. 5.7 is the section, B section, is the one that sets out the one-year and the five-year. And that's why when we look at the limitations on actions and the exception out, there's no reason for it to follow the residual clause because it contains its own clock. Its clock is a 60-day, one-year, and a five-year clock. And as a result, the parties knew what their obligations were. Petro-Edge knew what its obligation was. Schedule 3.25 of the Statoil-Petro-Edge agreement knew that they had this obligation to drill two additional wells. That's what their lawyer said and agreed to, two additional wells before a date in 2014. There's no question among the parties, and the arguments being made by Statoil, by this giant in the oil industry, are to accept an economic absurdity that simply the next day we could walk away of sawdust and wipe out the true value, the more than $1 million value of this deal. And the 18% override is essentially useless unless the wells get drilled. And to this family, the five-year critical time period was, in fact, the essence of the deal. You're well over your time. Thank you, Judge. We will come down and say hello to the lawyers, and then we'll go directly to the next panel.
judges: Diana Gribbon Motz, William B. Traxler Jr., Henry F. Floyd